RECEIVED
MAR 27 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| LARRY BAZILE | CIVIL ACTION NO. 10-0050 |
| -vs- | JUDGE DRELL |
| CHEVRON U.S.A. INC., et al. | MAGISTRATE JUDGE KIRK |

### REASONS FOR JUDGMENT

Plaintiff, Larry Bazile, filed this suit seeking compensation for damages he allegedly sustained in October 2009 when he was working as a galley hand in the employ of Eurest Support Services ("ESS") onboard the "Eugene Island 360," an oil platform owned by Chevron U.S.A. Inc. ("Chevron"). Jurisdiction is proper under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*[1] Given the March 14, 2012 Judgment dismissing Plaintiff's claims against his employer (Doc. 42), Chevron is the only remaining defendant. Plaintiff's claims for punitive damages were dismissed by Judgment dated March 15, 2012. (Doc. 45.) A bench trial was held on August 13, 2012. For the reasons set forth below, this Court will render judgment as follows: in favor of Plaintiff, Larry Bazile, and against Defendant, Chevron U.S.A. Inc. in the amount of $30,520.00, plus legal interest and costs as provided by law.

---

[1] The parties do not contest the oil platform on which the incident occurred is a fixed platform on the outer Continental Shelf in the Gulf of Mexico off the coast of Louisiana.

## I. ISSUES AND FINDING OF FACT

On October 5, 2009, at approximately 6:15 A.M., Mr. Bazile was exiting top bunk number 8-25 in the housing area of the Chevron oil platform. As he was descending the bunk's wooden ladder, it came loose from its moorings, and he fell backwards into objects in the sleeping quarters. The platform could house up to twenty-five people, but only six or seven persons were on the platform on the date of the alleged incident. Two of those persons, Nathaniel Francis and Plaintiff, were employees of ESS. Mr. Francis and Plaintiff shared the same room, but the accident itself was unwitnessed.

*Testimony of Larry Bazile*

Mr. Bazile testified that two or three months before the accident, the ladder had some missing screws at the top and one on the right side at the bottom. He was aware of these issues at the time. Plaintiff claims he had mentioned the ladder problem to Louis "Bones" Blanchard, a Chevron employee who worked on the platform, and, on another occasion, to an unnamed production hand on the platform who was also a Chevron employee.[2]

Despite the situation, Plaintiff had safely traversed the ladder many times, including when he awoke around 4:00 or 4:30 A.M. on the date of the incident and descended the ladder to go to work. Plaintiff then returned to his bunk around 6:00 A.M. for a short nap. According to Mr. Bazile, when he arose an hour later, he put his right foot down and thought he would hit the step, even though he was not then able to see where he was putting his foot, because he was on his stomach wriggling for the ladder

---

[2] Mr. Blanchard, however, testified he had no recollection of Mr. Bazile's having told him there were loose screws in the bunk room ladder. (Ex. 22).

feet first. He says he missed the step and started to fall backwards; he then grabbed the ladder, but the ladder ripped from the bed, causing him to fall into lockers and onto the floor. Photographs taken on the day of the accident portray the marks and screw holes on the top bunk where the ladder had been affixed and also show the detached wooden ladder. (Exs. 12 - 12.11.) Plaintiff reported the incident to Nathaniel Francis, who informed a Chevron employee, and an accident report was completed.[3] Plaintiff was then removed from the platform by helicopter for medical evaluation. Plaintiff claims he suffered injury to his right shoulder, back, and left knee in the fall.

*Testimony of Joe Williams, Jr.*

Joe Williams, Jr., a Chevron employee, testified he investigated bunk 8-25 and the surrounding area following Mr. Bazile's fall. To the best of his recollection, there were, at the accident scene, eight screws from the ladder matching the holes pictured in Exhibits 12-12.11; four screws on the top of the ladder and four screws on the bottom. Mr. Williams noted the screws on the bottom of the ladder were bent, as depicted in Exhibit 12.4.

*Medical Records*

The medical records show Plaintiff was forty-seven years old at the time of the accident and was fifty when the case was tried. He has a history of high blood pressure, cocaine use, depression, and panic disorder. He also has a history of obesity, with his weight estimated as ranging between 350 and 400 pounds from the time of the accident through the trial date.

---

[3] Chevron's "Incident Management Detail Report" shows the accident occurred when "[s]crews came out of the ladder rung causing [Mr. Bazile] to fall to the floor." (Ex. 1.)

*Deposition of Dr. Bryan McCann*

In his deposition taken on May 7, 2012 (Ex. 24), Dr. Bryan McCann, a family practice physician, testified he first saw Plaintiff nine days post-accident on October 14, 2009, for complaints of pain in his back, right shoulder, and left knee. Dr. McCann treated Plaintiff conservatively thirteen times between October 14, 2009 and June 18, 2010, and during that time prescribed Vicodin with injections of Depo-Medrol and Decadron. At times, Plaintiff's findings on physical examination were negative and at times positive. Throughout that period, Plaintiff continued to complain of pain in his back and right shoulder, which pain varied in intensity. Dr. McCann also prescribed physical therapy beginning in November 2009, and in February 2010, he referred Plaintiff to Dr. Louis Blanda, a Lafayette, Louisiana orthopaedic surgeon. Plaintiff began using a cane on his own in the spring of 2010. When Plaintiff started treating with Dr. Blanda, Dr. McCann stopped prescribing medication and deferred to Dr. Blanda's treatment regimen. During the entire time Dr. McCann treated Plaintiff, Dr. McCann opined Plaintiff was disabled from performing offshore work.

Dr. McCann, (who did not specifically remember treating Plaintiff but testified from the medical records), stated his notes did not reflect any mention of a fall from a ladder. Dr. McCann also denied awareness of an automobile accident on February 12, 2010, with subsequent treatment at Bunkie General Hospital.[4] When shown hospital records regarding the referenced auto accident, Dr. McCann observed Plaintiff

---

[4] Other than the information addressed during Dr. McCann's cross-examination, there was no additional evidence of an automobile accident or damages sustained therefrom.

complained at the time of left shoulder and left-sided neck pain, and that the impact during the accident was apparently relatively minor.

*Leglue Physical Medicine Clinic Records*

While being treated by Dr. McCann, Plaintiff visited Dr. Gerald J. Leglue, Jr. at the Leglue Physical Medicine Clinic of Alexandria, Louisiana during November 2009. (Ex. 18). Records from the visit reveal Plaintiff's complaints of neck and lower back pain following his fall from the ladder in October 2009, and complaints that the pain was exacerbated by walking, sitting, standing, and bending over. He also related experiencing weakness and numbness in his legs and back. In the Leglue records, Plaintiff mentioned visiting Dr. McCann about his back pain and receiving pain pills and a shot. The records do not indicate Dr. Leglue's diagnosis of Plaintiff's condition or specific treatment provided to Plaintiff.

*Depositions of Dr. Louis C. Blanda[5]*

In Dr. Louis C. Blanda's deposition taken March 4, 2011 (Ex. 25), the orthopaedic surgeon explained he first saw Plaintiff on June 10, 2010, at which time Plaintiff weighed 410 pounds. Plaintiff's main complaint was of low back pain with some referred pain to the legs, particularly the right. Plaintiff was using a cane. X-rays of Plaintiff's hips showed some degenerative changes and possible avascular necrosis, which could not be confirmed, because Plaintiff was too large to fit in the MRI[6] machine. He also had

---

[5] Dr. Blanda gave two depositions, both of which are included in Exhibit 25.

[6] MRI stands for "magnetic resonance imaging," an enhanced form of x-ray diagnostics.

5

spondylolysis or spondylolisthesis at L4-5. The physician explained the spondylolisthesis could be traumatic and could have been caused by the accident.

A CT scan[7] ordered by Dr. Blanda showed severe arthropathy at the L4-5 level with a disc bulge or something abnormal with the annular shape of the L4-5 disc. It further revealed right-sided narrowing and asymmetry, which could be a herniation. Plaintiff's neurological exam also found weakness in the legs, decreases in the Achilles and patella reflexes on the right side, and muscle weakness in the right foot.

When Dr. Blanda saw Plaintiff again on July 13, 2010, he recommended Plaintiff wear a back brace to help with Plaintiff's low-grade spinal instability, and he explained to Plaintiff that surgery was too risky, given Plaintiff's high blood pressure and weight. He also recommended an epidural steroid injection. Plaintiff was not able to have the injection either, because of his high blood pressure. By September 28, 2010, there was really no change. At that point, Dr. Blanda's diagnosis was a bulging disc with some spinal instability at L4-5. With Plaintiff's symptoms, Dr. Blanda would have recommended only sedentary work at that time, but would have preferred to obtain a functional capacity evaluation. This was apparently never accomplished.

Plaintiff returned on February 22, 2011 with continued complaints of severe back pain. At that time, Plaintiff was taking Lortab 10 and Soma, a muscle relaxer. Dr. Blanda considered him disabled from returning to his usual work.

---

[7] A "CT scan" is a "computed tomography" scan that uses x-rays to make detailed pictures of structures inside the body.

Under questioning from Plaintiff's attorney on whether the ladder fall caused Plaintiff's injury and complaints, Dr. Blanda said, "[H]is injuries either caused or aggravated this area. If it was preexisting, then it made it symptomatic."[8]

Plaintiff updated Dr. Blanda's deposition on June 27, 2012. (Ex. 25.) The notes reflected that Plaintiff had returned to Dr. Blanda on May 26, 2011 with continuing complaints of back and leg pain. Physical therapy had been recommended but apparently had not been approved by the employer. Plaintiff was trying to lose weight. Dr. Blanda refilled Plaintiff's prescriptions and continued him on a "no work" status. When Plaintiff returned on August 25, 2011, he was going through physical therapy, but he still had back and leg pain.

At Plaintiff's next visit, on October 28, 2011, he had been able to have an MRI at an Open Air MRI facility. The MRI, which was more helpful to Dr. Blanda than the previous CT scan, definitely revealed a central and right sided herniated disc at the L4-5 level that was causing significant spinal stenosis. It also showed some associated changes at L5-S1 and L3-4. At that point, Dr. Blanda thought Plaintiff was a surgical candidate, but surgery was too risky given Plaintiff's weight and high blood pressure. When Plaintiff returned on December 13, 2011, Dr. Blanda still thought he was in a "no work" status, because of the L4-5 herniation. Dr. Blanda reiterated that unless some history to the contrary existed, he would relate the disc herniation to the October 5, 2009 fall.

---

[8] Ex. 25, March 4, 2011, deposition, pp. 26-27.

Dr. Blanda last saw Plaintiff on March 15, 2012, at which time, according to him, Plaintiff was sincerely trying to lose weight. He continued to have the same back and leg pain, however, and he was kept in a "no work" status. He was instructed to return in four to five months.

Under cross-examination, Dr. Blanda admitted he had been seeing Plaintiff for about two years, during which time Plaintiff had not lost weight nor decreased his blood pressure. Dr. Blanda also said that three-fourths of disc injuries get better eventually without surgery.

Counsel for Defendant then asked: "Now, Doctor, it's your opinion isn't it that Mr. Bazile likely has an aggravation of a pre-existing back condition; is that correct?" Dr. Blanda responded:

> Well, he's got probably both. I know in the deposition I probably said he had an aggravation injury and I think that was related to the spondylolisthesis. That was before we had the availability of the MRI scan that showed a herniation. So he's got both. I think he's got an aggravation injury, plus I think the herniation most likely is new because of the acute onset of persistent problems with his back. So I think there's both when you look at the MRI.[9]

## II. APPLICABLE LAW AND ANALYSIS

"The Outer Continental Shelf Lands Act (OCSLA) mandates that when disputes arise involving fixed structures erected on the outer Continental Shelf, applicable laws of the adjacent state will be applied to the extent not inconsistent with other federal laws and regulations." Coulter v. Texaco, Inc., 117 F.3d 909, 911

---

[9] Ex. 25, June 27, 2012, deposition, pp. 26-27.

(5th Cir. 1997) (internal citations omitted); see also 43 U.S.C. § 1333(a)(1) and (2). The state tort law of Louisiana thus governs disposition of these facts.

Louisiana Civil Code art. 2315 provides, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Louisiana courts have interpreted this section to require proof of the basic elements of negligence. Namely, a plaintiff must establish: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. Perkins v. Entergy Corp., 782 So.2d 606, 611 (La. 2001). Veals v. Nautical Adventures, LLC, 354 Fed.Appx. 843, 845, (5th Cir. 2009).

The jurisprudence explains that the owner or operator of a facility has the duty to exercise reasonable care for the safety of people on its premises and the duty not to expose such persons to unreasonable risks of injury or harm. Mundy v. Dept. of Health and Human Resources, 620 So.2d 811, 813 (La. 1993).

Under Louisiana Civil Code art. 2323(A):

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty . . . . If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

In this case, Chevron takes the position the accident was caused solely by Plaintiff's failure to place his foot on the step of the ladder. Plaintiff counters that he would not have fallen if the loose screws in the ladder, which he had reported to two Chevron employees, had not given way when he tried to regain his balance. Also, Defendant argues Plaintiff himself was responsible for assigning rooms and bunks on the platform, so he could have selected a lower bunk for himself, particularly if <u>he</u> thought his bunk was not safe. Plaintiff responds his boss, Nathaniel Francis, actually assigned the bottom bunk, and Plaintiff could not challenge Francis's choice. Additionally, Chevron notes Plaintiff had used the top bunk 270 to 350 times with no problem, and he had used it up to 125 times after he learned the screws at the top of the ladder were loose. Further, Chevron argues the ladder did not collapse. Rather, it simply pulled free from the bunk frame under the weight of the obese Plaintiff.

Despite Chevron's contentions, the photograph of the bent screws in Exhibit 12.4 supports Mr. Bazile's claim that the top screws on the ladder were likely stripped and just popped out. After a thorough review of the facts and applicable law, we find Chevron to be twenty percent at fault for Mr. Bazile's injuries because, first, it should not have assigned a bed in a top bunk to a man weighing between 350 and 400 pounds. Even if the screws in the ladder had not been loose, the wooden bunk ladder was not sufficient to hold Mr. Bazile's weight. Second, Chevron apparently did have notice of the problem with the screws and failed to remedy it. However, we find Mr. Bazile to be eighty percent at fault in this matter, because he continued using the ladder even though he knew the screws were loose and knew he

had "stop work" authority and could have ceased using his assigned bunk until the ladder screws were repaired.

We refer to the jurisprudence for guidance on general damages. In <u>Gradnigo v. Louisiana Farm Bureau Cas. Ins. Co.</u>, 6 So.3d 367 (La. App. 3d Cir. 2009), the court awarded $40,000.00 in general damages to a woman who was in a car accident. An MRI conducted six months after the accident revealed small or mild disc herniations at T5-T10 considered likely to be degenerative, bone spurs, and a lumbar bulging disc. <u>Id.</u> at 374. She received treatment from a pain management physician and only missed seven days of work. <u>Id.</u> at 371. The plaintiff did not have surgery before trial, but her doctor discussed the possibility of future surgery. <u>Id.</u> at 374.

In <u>Raimondo v. Hayes</u>, 30 So.3d 1177 (La. App. 3d Cir. 2010), the court awarded $65,000.00 in general damages to a woman involved in a vehicular accident. An MRI revealed disc injuries at L4-5, L5-S1, T6-7, and T8-9. <u>Id.</u> at 1178. Following physical therapy, a TENS unit, home stretching, muscle relaxers, and pain medications, she reached maximum medical improvement. <u>Id.</u> at 1179. The court found she would continue to experience chronic pain throughout her life. <u>Id.</u>

The appellate court considering <u>Coutee v. Global Marine Drilling Co.</u>, 895 So.2d 631 (La. App. 3d Cir. 2005) awarded $100,000.00 in general damages to a man who fell from a work deck platform. <u>Id.</u> at 635. An MRI revealed multiple levels of degenerative disc disease and a herniated disc at the L4-5 level on his right side. <u>Id.</u> at 646. In addition, a neurosurgeon determined the plaintiff suffered from myofascial pain syndrome. <u>Id.</u> The plaintiff was also diagnosed with major episodic depression,

11

moderate, secondary to persistent pain and chronic pain syndrome resulting from an occupational injury. Id. at 636-37.

In the case at bar, Mr. Bazile's MRI showed a central and right sided herniated disc at the L4-5 level that was causing significant spinal stenosis. It also revealed some associated changes at L5-S1 and L3-4. The MRI results correspond closely with the injury described in Raimondo where plaintiff experienced disc injuries, did not receive surgery, and would continue to experience chronic pain throughout her life. Unlike the Gradnigo plaintiff, who only missed seven days of work, Mr. Bazile has not been able to return to work since the accident. Also, unlike the Coutee plaintiff, Mr. Bazile was not diagnosed as suffering from major depression or myofascial pain syndrome.

Based upon the medical information detailed above, we assess Mr. Bazile's general damages at $65,000.00 and reduce the award by eighty percent to account for Mr. Bazile's comparative fault. Thus, we find Mr. Bazile is entitled to $13,000.00 in general damages.

We also award Plaintiff damages for lost wages based on the report from G. Randolph Rice, Ph.D., an economist. (Ex. 26). Dr. Rice estimates Mr. Bazile experienced wage losses from the time of the accident to the time of the trial in the amount of $87,599.00. Therefore, we award Mr. Bazile lost wages in the amount of $87,600.00, reduced by eighty percent for Mr. Bazile's comparative fault. Accordingly, we find Mr. Bazile may recover $17,520.00 in lost wages.

## III. CONCLUSION

For the foregoing reasons, this Court will render judgment as follows: in favor of Plaintiff, Larry Bazile, and against Defendant, Chevron U.S.A. Inc., in the total amount of $30,520.00 plus legal interest from the date of judgment and costs as provided by law. All of Plaintiff's remaining presented claims will be dismissed with prejudice.

SIGNED on this 27th day of March, 2013 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT